IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Chief Judge Marcia S. Krieger

Civil Action No. 13-cv-02476-MSK

**MARIA F. JIMENEZ,**

    Plaintiff,

v.

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.

**OPINION AND ORDER REVERSING COMMISSIONER'S DECISION**

**THIS MATTER** comes before the Court upon review of denial of benefits by the Defendant, Commissioner of Social Security. This matter was initiated by the Plaintiff, Ms. Jimenez, without the assistance of counsel. She filed a letter in support of her Complaint **(#19)**. The Commissioner responded with a brief **(#23)**. Pursuant to D.C.COLO.LAttyR 15(f), *pro bono* counsel entered an appearance on Ms. Jimenez's behalf, and supplemental briefing **(#34, 35)** was filed. Having considered all of the documents filed, including the record **(#17)**, the Court now finds and concludes as follows.

**I. Jurisdiction**

The Court exercises jurisdiction pursuant to 42 U.S.C. §405(g). The Plaintiff filed applications in August 2010 for disability insurance benefits (DIB) and supplemental security income (SSI) under Titles II and XVI of the Act. The Administrative Law Judge (ALJ) conducted an administrative hearing, and on April 26, 2012 issued an unfavorable decision finding that the Plaintiff was "not disabled" (hereafter, the Decision). The Appeals Council

declined to review the Decision (Tr. 1-3), making it final decision for purposes of judicial review.  *See*, 20 C.F.R. § 422.210(a).  There is no dispute that this appeal was timely initiated.

## II.  Material Facts

Ms. Jimenez was born on May 7, 1976.  At the time of the Decision, she was 32 years old.  She had limited education and had worked as a pawn broker, order puller, photo finish lab worker, and as an assistant retail sales manager at Walgreens.  She contends that a combination of mental impairments (post-traumatic stress disorder, depression, and anxiety) and physical impairments (migraine headaches, hypertension, obesity, and lumbar back pain) prevent her from working.

Both her mental and physical impairments have origins in a series of deaths of people close to Ms. Jimenez.  In 2000, Ms. Jimenez's fiancée was murdered in front of her while she was held hostage at gunpoint.  After his murder, Ms. Jimenez started experiencing depression, anxiety, and post-traumatic stress disorder (PTSD).  Two years later, Ms. Jimenez's brother passed away from AIDS.  Then, in 2008, her other brother was killed by a family member.  Following this third death, Ms. Jimenez's mental impairments and physical impairments began to severely affect her ability to work.  Ms. Jimenez became unable to work in April 2010.

Only Mr. Jimenez's migraine headaches are the subject of this appeal.  Ms. Jimenez began experiencing headaches in 2000, but they became more numerous and more intense during 2010, occurring 3-5 times per week and accompanied by nausea, photosensitivity, and sound sensitivity.  In September 2010, Ms. Jimenez sought medical treatment at Clinica Campesina.  Notes by treating physician, Dr. Carlos Brol, M.D., report her complaints of severe headaches more frequently than 3-5 times per week with a pain intensity of 8-10 on a 10-point scale.  In November, he diagnosed the headaches as, Chronic: Migraine NOS [with] intractable migraine.

The diagnosis continued throughout Dr. Brohl's treatment notes and those of Dr. Rachel Miller, who took over Ms. Jimenez's care in 2011. Although migraine headaches were not Ms. Jimenez's only medical issue, they were a repetitive source of concern and treatment. She consistently and repetitively reported to her treating physicians, and psychologist, Elizabeth Lowell-Tupa, Ph.D., that the migraines occurred multiple times a week, seemed to get worse as her blood pressure went up, and frequently were so severe that she was photophobic, had to lie down, and could not concentrate. Her medical records reflect an initial prescription of Imitrex, but it did not prove effective. Unable to afford more expensive abortive medication, Ms. Jimenez resorted to over-the-counter analgesics, which were not effective.

The examining consulting physician, Deborah Moore, M.D., included migraines as a diagnosis in her report. She noted, "[t]he claimant has migraines with classic symptoms and is unable to afford abortive medications. She had one this morning with nausea and vomiting but did not have a sensitive reaction to a light shined in her pupil, although she was wearing shades when I walked into the room. She did not appear to be in any pain at this time." Dr. Moore did not opine as to the frequency or severity of the migraines, recommending only that, "[t]he claimant has limitations working around bring lights or excessive noise due to migraine headache."

At her disability hearing, Ms. Jimenez testified that she experiences multiple debilitating migraines each week, but can only afford over-the-counter medications. The ALJ posed hypothetical questions to a vocational expert, including whether an individual who is forced to miss one day of work per week because of headaches would be able to perform competitive work in the national economy. The vocational expert responded by stating that such symptoms were inconsistent with gainful employment.

### III. The ALJ's Decision

The ALJ employed the standard five-step analysis. At Step 1 he found that Ms. Jimenez met the insurance status requirements and that she had not engaged in substantial gainful activity after April 18, 2010. At Step 2, he found that she had severe impairments — chronic headaches, anxiety disorder, PTSD, depression, obesity, hypertension, and lumbar back pain. At Step 3, he found that none of these singly, or in combination, met or were the equivalent to one of the listed impairments in 20 C.F.R. Part 404, Subpt. P, App. 1. At Step 4, the ALJ determined Ms. Jimenez's had a residual functional capacity (RFC) to perform light work, but was limited to lifting and carrying 10 pounds frequently and 20 pounds occasionally, sitting or standing for six hours in an eight-hour work day, avoid climbing ladders or scaffolds, not work around open machinery, only be exposed to occasional interactions with co-workers and supervisors, occasionally stoop or kneel, not be exposed to complicated instructions, not interact with the public, avoid work in sunlight, and only be exposed to moderate noise, and that she could not perform her past relevant work. At Step 5, he found that she was able to perform other jobs in the national economy, including merchandise marker and electronics accessories assembler.

### IV. The Issue Presented

Ms. Jimenez contends that the ALJ erred at Steps 4 and 5 by failing to consider all objective and subjective evidence, and to make specific findings, with regard to the severity and frequency of her migraine headaches.

### V. Standard of Review

The Court reviews the Commissioner's decision to determine whether substantial evidence in the record as a whole supports the factual findings and whether the correct legal standards were applied. *See Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). Substantial

evidence "requires more than a scintilla but less than a preponderance." *Id*. "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See id*. Further, the Court "will not reweigh the evidence or substitute [its] judgment for the Commissioner's . . . [and] may not displace the agency's choice between two fairly conflicting views, even though the [C]ourt would justifiably have made a different choice had the matter been before it de novo." *See id*. As to the correct legal standard, a decision must be reversed if the ALJ either uses the wrong standard or fails to clearly demonstrate reliance on the correct standard. *See Glass v. Shalala,* 43 F3d 1392 (10th Cir. 1994).

The Step 4 challenge raises an issue of whether the correct legal standard was employed. The Step 5 challenge raises a question of whether the ALJ's finding that there were jobs in the national economy that Ms. Jimenez could perform is supported by substantial evidence.

## VI. Analysis

At Steps 4 and 5 in the disability analysis, the ALJ is required to assess a claimant's RFC based on all relevant evidence, medical or otherwise. 20 C.F.R § 404.1545. As part of this evaluation, the ALJ must take into consideration all the claimant's symptoms, including subjective symptoms. 20 C.F.R. § 404.1529(a). Subjective symptoms — such as pain — are those that cannot be objectively measured or documented. In assessing subjective symptoms, the ALJ must consider statements of the claimant relative to objective medical evidence and other evidence in the record. 20 C.F.R. § 404.1529(c)(4). If a claimant has a medically determinable impairment that could reasonably be expected to produce the identified symptoms, then the ALJ must evaluate the intensity, severity, frequency, and limiting effect of the symptoms on the claimant's ability to work. 20 C.F.R. 404.1529(c)(1). At the time of the Decision, SSR 96-7

required that the ALJ assess the credibility of a claimant's statements about her symptoms to make that determination.[1]

In the Tenth Circuit, this analysis is usually described as having three steps: (1) the ALJ must determine whether there is a symptoms-producing impairment established by objective medical evidence; (2) if so, the ALJ must determine whether there is a "loose nexus" between the proven impairment and the claimant's subjective symptoms; and (3) if so, the ALJ must determine whether, considering all the evidence, both objective and subjective, the claimant's symptoms are in fact disabling. *Luna v. Brown*, 834 F.2d 161, 163-64 (10th Cir. 1987). At the third step of the *Luna* analysis, the ALJ must consider pertinent evidence including a claimant's history, medical signs, laboratory findings, and statements from the claimant, medical or non-medical sources, or other persons. C.F.R. § 404.1529(c)(1).

The ALJ must make specific evidentiary findings with regard to the existence, severity, frequency, and effect of the subjective symptoms on the claimant's ability to work. 20 C.F.R. 404.1529(c)(4). This requires specific evidentiary findings supported by substantial evidence. *Huston v. Brown*, 838 F.2d 1125, 1133 (10th Cir. 1988).

Ms. Jimenez argues that the Decision contains no factual findings regarding the severity, frequency, and limiting effect of her migraine headaches, and that there is no evidence that the ALJ considered objective and subjective evidence in the record. This, she contends, is legal error at Step 4 and deprives the ALJ's Step 5 determination of support by substantial evidence. The Commissioner responds that the ALJ considered both objective and subjective evidence pertaining to Ms. Jimenez's migraines, and implicitly found that Ms. Jimenez's statements were not credible insofar as she claimed her migraines were "debilitating."

---

[1] SSR 96-7p has since been superseded by SSR 16-3p, which no longer requires a credibility assessment.

Each argument has some merit. The Decision reflects some consideration of objective and subjective evidence relative to Ms. Jimenez's migraines. It refers to Ms. Jimenez's testimony that she suffers headaches ranging from moderate pain at a level of 5-6 to the most severe pain possible at level 10. It acknowledges that Mr. Jimenez's treatment records show that she experienced multiple headaches per week throughout 2011. The Decision describes Ms. Jimenez's report of her migraine symptoms and history to Dr. Moore and acknowledges that Dr. Moore diagnosed Ms. Jimenez as suffering from migraines with classic symptoms — nausea, vomiting, light, and sound sensitivity. Indeed, the ALJ gave the opinion of Dr. Moore substantial weight and incorporated the light and sound limitations into the RFC.

The Decision, however, does not address other uncontroverted evidence that is supportive of Ms. Jimenez's statements as to the severity and frequency of her migraine headaches. For example, it makes no note of the consistency between Ms. Jimenez's testimony and her statements to Drs. Brol and Miller and consulting examiners Drs. Moore and Lowell-Tupa that she had severe migraine headaches multiple times per week. Indeed, very little information about her migraine treatment is provided. The Decision mentions only her first consultations with Dr. Brol in September and October 2010, when his initial diagnosis was "tension headaches with migraine features." The Decision fails to note that in November 2010, Dr. Brol changed his diagnosis to "intractable migraines,"[2] which diagnosis continued thereafter. In addition, the Decision makes no mention of Ms. Jimenez's unsuccessful trial with Imitrex or her inability to afford other abortive medication.

---

[2] An intractable migraine describes a chronic headache "that is difficult to treat or fails to respond to standard and/or aggressive treatment modalities." Stephen D. Silberstein, David Dodick & Starr Pearlman, *Defining the Pharmacologically Intractable Headache for Clinical Trails and Clinical Practice*, AMERICAN HEADACHE SOCIETY, Oct. 2010, at 1499.

Ultimately, the error at this step is a legal one — there are no factual findings as to the severity, frequency, and effect of Ms. Jimenez's migraines on her ability to work. Simply put, there is no determination of how frequently she experiences migraine headaches of sufficient intensity that they impair or prevent her ability to work. In lieu of such findings, the Decision contains a circular conclusion:

> . . . the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not fully persuasive to the extent they are inconsistent with the above residual functional capacity assessment for the reasons stated below.

There are no reasons stated thereafter that address the frequency or severity of Ms. Jimenez's migraines. The ALJ notes that Ms. Jimenez had a normal neurological examination, but the significance of this statement is unclear given the etiology of a migraine headache and the fact that every doctor who examined Ms. Jimenez diagnosed her as suffering from migraines. The ALJ also refers to Dr. Brol's initial diagnosis, tension headaches with migraine features, but as noted earlier, Dr. Brol revised the diagnosis in November 2011 and all of the doctors who have examined Ms. Jimenez agree with the migraine diagnosis.

The failure to make findings as to the frequency and severity of Ms. Jimenez's migraines is legal error requiring reversal. In addition, its significance is evident in the ALJ's Step 5 analysis. At Step 5, the ALJ found that there were significant jobs in the national economy that Ms. Jimenez could perform. However, this finding is not supported by substantial evidence. To the contrary, the vocational expert testified if a person with the RFC described by the ALJ missed "as little as one day a week" due to headaches or depression, such person could not perform competitive work.

There are no factual findings that Ms. Jimenez would be able to complete a work week in light of her headaches. Indeed, uncontroverted evidence in the record is that Ms. Jimenez suffered from severe migraines (at a pain level of 10) three or more times a week during 2010 and 2011. Even if the frequency of her headaches was overstated by two-thirds, Ms. Jimenez would still have experienced at least one severe migraine every week that would cause her to miss work. This, in the opinion of the vocational expert would make Ms. Jimenez unemployable.

For these reasons, the Court finds that the ALJ erred at Step 4 and Step 5. The errors are not harmless.

## VII. Conclusion

For the forgoing reasons, the Decision of the Commissioner denying Ms. Jimenez disability insurance benefits and supplemental security income is **REVERSED**, and the matter is **REMANDED** for a new determination. The Clerk shall enter judgment in conformance herewith.

Dated this 18th day of August, 2016.

                                                        **BY THE COURT:**

                                                        Marcia S. Krieger
                                                        Chief United States District Judge